## ALASKA S. S. CO. v. COLLINS.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1904.)

No. 982.

1. SHIPPING—INJURIES TO WHARVES—EVIDENCE—QUESTION FOR JURY.

In an action for injuries to plaintiff's wharf, which was struck by defendant's vessel, the question whether the wharf fell by reason of the negligence of the operatives of the vessel was for the jury.

2. SAME—DAMAGES—EXCESSIVENESS.

Where, in an action for injuries to a wharf, the uncontradicted testimony was that it would take from 15 to 30 days to make necessary repairs, and that plaintiff would suffer a loss within such time of $500, and several witnesses testified that it would cost between $1,350 and $1,800 to repair the same, and the only evidence for defendant was a witness who testified that he offered to make the repairs for $900, a judgment in favor of plaintiff for $2,064 was not excessive.

In Error to the District Court of the United States for the First Division of the District of Alaska.

This is an action to recover damages for an alleged injury to a wharf owned by the defendant in error, caused by the negligence of the steamer Dirigo, owned by the plaintiff in error, and for the deprivation of profits that would have accrued to the plaintiff from the use of the wharf. The case was tried before a jury, and resulted in a general verdict in favor of the defendant in error in the sum of $2,689, which amount was reduced by the court, on motion for a new trial, to $2,064. In the assignments of error, it is alleged that the court erred in the following particulars: "(1) In refusing to instruct the jury to render a verdict for the defendant—there being no evidence of any willfulness, carelessness, or negligence on the part of the defendant in the conduct of the said steamer Dirigo—which request was made by the defendant, refused by the court, and duly excepted to by defendant. (2) In refusing to charge the jury that they could not return a verdict in favor of the plaintiff for more than $900, and the value of the rents and profits lost while said wharf was being repaired—in that the only evidence, and the uncontradicted evidence, was that to repair said wharf, using the material then on hand which could have been saved and used, was $900, and the time required to so repair the premises was

thirty days—which request was duly made by defendant, refused by the court, and excepted to by defendant. * * * (4) In rendering judgment against the defendant in the case—in that judgment should have been for the defendant, and should, at least, have been in no greater sum than $1,400 and costs—which action of the court was duly excepted to by defendant."

Ira Bronson and R. W. Jennings, for plaintiff in error.

W. E. Crews and Lorenzo S. B. Sawyer, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts as above). 1. A brief reference to some of the testimony is, of itself, sufficient to show that the court did not err in refusing to instruct the jury to find a verdict for the defendant in the court below (plaintiff in error here).

The witness J. G. Grant testified that he knew the steamer Dirigo, and saw her come into the wharf on the night of the injury, between 11 and 12 at night, and was upon the wharf at that time. "She came in about quartering on the dock, and when she got close—I was standing there—I heard the captain say: 'Get out of the way. She is going to strike.' Of course; about that time I saw she was going to strike, and I run towards the shore, and, before I got to where it broke down, the wharf opened right up, two feet at least, and took about anywheres from 180 to 200 feet out of the wharf; struck about 180 feet from the corner—the face of the dock on that approach—and she went about two-thirds through the wharf, and then she backed off. * * * Q. When did the wharf fall, if at all? * *. * A. In about four or five hours—as soon as the tide went out. Q. Explain to the jury how the boat came in? A. She came with the bow on, about quartering. Q. About what rate of speed was the boat going? A. It was making fair headway. I'm no judge of that."

In the cross-examination of this witness, the following questions and answers appear:

"Q. About how far did the Dirigo itself go through the dock? A. About two-thirds of the way. Q. Well, how far is that? A. About twenty feet. Q. Do you mean to say that the Dirigo went through that dock twenty feet, and then backed out? A. I do."

J. Ammundsen testified that he was on the dock at the time the Collins Wharf was broken down by the steamer Dirigo; that he saw the boat coming in, and thought at first she was coming out on the outside end, but after she came near she turned towards the approach, "and she came in at quite a speed. The engine was reversed, but it was too late, as I could see she couldn't possibly stop in time to do much good, and she came right quartering, * * * and went about two-thirds into the wharf, and there she stood; and then they backed her out again, and then afterwards they took her alongside of the wharf again. Q. What became of the wharf—the portion that was struck by the Dirigo? A. It went down in the night. Q. What was the state of the tide at that time? A. It was toward high tide."

Fred Ammundsen testified that he was engaged as night wharfinger on the wharf of Collins at the time of the accident. "The steamer Dirigo hove in sight, and was going to make a landing at the side,

evidently, but turned too quick, and ran into the dock. * * * She went about two-thirds through the dock, and smashed the timbers—'timbers were sticking up all along—and then she backed out again."

The witness Smittson testified: That he was an engineer, and was present at the wharf at the time, and saw the collision. That the boat struck the dock, and went about three-quarters of the way in through the dock. "Q. What effect did it have on the timbers of the dock, the piling, and so forth? A. Well, it give it a good, clean knock-out. What I seen, it broke the big twelve by twelve, and broke four or five or a half a dozen three by twelves, or something like that." That about 200 feet of that portion of the dock was down the next morning when he was there.

There was evidence on behalf of the steamship company to the contrary. The captain, among other things, said, in speaking of the speed of the steamship:

"She was going so slow it would be pretty hard to any more than guess at it. A ship coming into the dock that way must necessarily come in very slow—perhaps a half or three-quarters of a mile per hour." That he slowed down about six or seven, by the ship's time, and made the landing about eight or nine minutes later, which was a minute or two longer than the ordinary time consumed, and that he "didn't hit the dock any harder than usual."

We are not called upon to determine the weight of the evidence. That was the duty of the jury. Our province ends with determining whether or not there was sufficient evidence on the question of negligence to authorize the court to submit it to the jury. And this question, in the light of the evidence, must be answered in the affirmative.

In this connection it is proper to state that the contention is made by the steamship company that, inasmuch as the portion of the dock which fell was nearly 200 feet behind the part of the wharf where the steamer struck, its falling down constituted no evidence of neglect or carelessness on the part of the steamer. In its brief, counsel say:

"In fact, the steamer rubbed against the dock hard enough to jar this rickety lot of old piles (which had been erected on a reef of rocks at the same time with several other docks, and which had fallen down from natural decay) loose from the main dock, which had been repaired, so that, when the support of the main wharf was loosened, the whole two hundred feet collapsed."

Testimony was offered by it tending to show that the life of a pile at Wrangel Harbor is ordinarily from three to four years, and that the piles which fell had been in use about four years, and were eaten up by teredos.

On the other hand, the plaintiff, Collins, testified that he left Wrangel about the 10th day of January, 1902, which was about 15 days prior to the injury, and went to Seattle; that when he left for Seattle, on the 10th, the wharf was in "first-class condition, with the exception of one bent. Q. How long since you had repaired it? A. I repaired it thoroughly in August or September. Q. You stated it was in first-class condition? A. Yes, sir. Q. Now, what condition did you find it in when you returned from Seattle? A. I found it was knocked down—about 250 feet knocked all to pieces." The other witnesses introduced in his behalf testified that at the time of the injury the wharf was in good, or fairly good, condition, and in good working order.

'The' conflict raised by the testimony was a matter which the court properly submitted to the jury. The general rule is well settled that the plaintiff is entitled to have the question submitted to the jury, un-'less no recovery could be had upon any view which could be properly taken of the facts which the evidence tended to establish. Kane v. Northern Central Ry. Co., 128 U. S. 91, 9 Sup. Ct. 16, 32 L. Ed. 339; Dunlap v. Northeastern R. Co., 130 U. S. 649, 652, 9 Sup. Ct. 647, 32 L. Ed. 1058; L. & N. R. Co. v. Woodson, 134 U. S. 614, 621, 10 Sup. Ct. 628, 33 L. Ed. 1032; Washington Railroad Co. v. McDade, 135 U. S. 554, 571, 10 Sup. Ct. 1044, 34 L. Ed. 235.

The second and fourth assignments of error are without merit. The testimony was uncontradicted to the effect that it would take anywhere from 15 to 30 days to make the necessary repairs to the wharf, and that 'plaintiff would suffer a loss within that time of $500. There was some difference in the opinion of the witnesses as to what the needed repairs would cost, to put the wharf in as good condition as it was before the accident. The plaintiff testified that it would cost $1,750. One witness testified that he offered to repair the breach which was broken, with new stuff, for $1,350. Another thought it was worth $1,570. Still another placed it at $1,800, but suggested that this sum would be sufficient to make it a little wider than it was before the accident. R. B. Bell, a witness on behalf of the steamship company, testified: "I was asked what I would repair the damage for. I offered to do it for $900. That is all I know about it." Comment upon this testimony seems unnecessary.

At the time the jury retired to render their verdict, the court, at the request of the defendant in error, submitted to the jury the following special findings of fact: (1) "How much would it have cost to repair the premises, using the old materials then on hand, and which could have been saved and used?" And the answer was, "$1,564." (2) "How long would it take to so repair the premises?" And the answer was, "Thirty days." The testimony, as before stated, was undisputed that one month's loss of profits would amount to $500. The court, on the motion for a new trial, reduced the general verdict of the jury to $2,064, so as to make it agree with the special findings of fact by the jury.

The judgment of the district court is affirmed, with costs.